**SEMENZA KIRCHER RICKARD**
Jarrod L. Rickard, Bar No. 10203
jlr@skrlawyers.com
Katie L. Cannata, Bar No. 14848
klc@skrlawyers.com
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone:  (702) 835-6803
Facsimile:   (702) 920-8669

**LEVINE KELLOGG LEHMAN**
**SCHNEIDER + GROSSMAN LLP**
Jeffrey C. Schneider, Esq.
Florida Bar No. 933244
(*pro hac vice forthcoming*)
jcs@lklsg.com
Jason K. Kellogg, Esq.
Florida Bar No. 0578401
(*pro hac vice forthcoming*)
jk@lklsg.com
Marcelo Diaz-Cortes, Esq.
Florida Bar No. 118166
(*pro hac vice forthcoming*)
md@lklsg.com
100 SE 2nd Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile:  (305) 403-8789
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GEOFF WINKLER, as court-appointed receiver for J&J Consulting Services, Inc, an Alaska corporation; J&J Consulting Services, Inc., a Nevada corporation; and J and J Purchasing LLC, Florida limited liability company, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

1

Plaintiff, Geoff Winkler (the "Receiver"), as court-appointed receiver for J&J Consulting Services, Inc., an Alaska corporation; J&J Consulting Services, Inc., a Nevada corporation; and J and J Purchasing LLC, Florida limited liability company (collectively, the "Receivership Entities"), alleges as follows against Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"):

### INTRODUCTION

1.  This action follows the collapse of a Ponzi scheme operated through the trust account of Nevada lawyer Matthew Beasley ("Beasley") and his firm, Beasley Law Group PC.  Judge Mahan appointed the Receiver for the Receivership Entities in the pending action *SEC v. Beasley*, 2:22-cv-00612-CDS-EJY (D. Nev.) (the "SEC Action").  Beasley is a principal defendant in the SEC Action and has been indicted on charges of wire fraud and money laundering in *United States v. Beasley*, 2:23-cr-0066-JAD-DJA (D. Nev.) (the "Criminal Action").

2.  The Receiver brings this action against Wells Fargo to hold it accountable for assisting and enabling Beasley's years-long scheme, which left the Receivership Entities insolvent and facing charges by the SEC.  The purported investment model (referred to herein as the "J&J Investment") was presented as straightforward. Investor funds were raised through the Receivership Entities to make advances on personal injury settlements that would generate a return of at least 12.5% every 90 days.  Beasley and his firm were supposed to be managing the relationships with the personal injury claimants' counsel and using the Receivership Entities' funds to make the intended settlement advances. Based on the false returns and commissions Beasley generated, the Receivership Entities' fundraising increased exponentially.

3.  The purported settlements and personal injury plaintiffs, however, did not exist, and Beasley instead used the Receivership Entities' funds to cover fake returns to investors, commissions to promoters, and lavish personal expenses. This was a Ponzi scheme from the start, and Beasley misled the Receivership Entities from the outset. Beasley's trust account at Wells Fargo served as the vehicle to disguise and recharacterize the funds from investment funds into purported profits. Indeed, Wells Fargo hosted Beasley's trust account and executed the deceptive transactions that allowed Beasley to run the Ponzi scheme and dissipate the Receivership Entities'

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

funds. These same transactions form the bases of the money laundering charges that Beasley now faces in the Criminal Action.

4.   Beasley, as the de facto fund manager for the Receivership Entities' investment operations, owed the Receivership Entities fiduciary duties and was dutybound to deploy their funds with their best interests in mind.  Running a Ponzi scheme with the Receivership Entities' funds, along with his misappropriation and diversion of funds, violated those duties.

5.   At the heart of the scheme was Beasley's Interest on Lawyers Trust Account ("IOLTA") with Wells Fargo, which processed over $490 million in funds of the Receivership Entities.  Trust accounts like IOLTAs are sacrosanct.  Lawyers, by virtue of their licensure, are trusted to receive and hold client funds in their trust accounts for the benefit of their clients.  Lawyers must account for the client funds in their trust accounts and, critically, must not use client funds to pay another client's obligations or for other unauthorized purposes. Trust accounts are thus subject to higher scrutiny because they contain (temporarily) commingled client funds and present risks of embezzlement and money laundering. When an attorney misuses their trust account—like here—the resulting loss falls on the owner of the funds.

6.   Despite the unique nature of trust accounts, Beasley was able to use his firm's Wells Fargo IOLTA to take in the Receivership Entities' funds and divert them from their intended purpose. Instead of being deployed for any legitimate investment purpose, Beasley used the Receivership Entities' funds to operate a classic Ponzi scheme, paying himself and other promoters fake commissions and distributing false returns to investors.  All told, albeit subject to further analysis, Beasley's actions resulted in a loss to the Receivership Entities of over $100 million.

7.   From a bank's perspective, the fraudulent scheme was obvious.  A Ponzi scheme of this magnitude cannot be run surreptitiously through an IOLTA and various related-party accounts. Beasley admitted during an armed standoff with FBI agents that the Ponzi scheme would be "clear as soon as they go through my bank records."  Beasley was right.  The Wells Fargo bank records demonstrate an egregious use of an attorney trust account to swirl around funds for no business or legal purpose, with over $450 million being sent from Beasley's IOLTA to Beasley himself and the investment promoters.  At the same time, Wells Fargo saw almost $380 million flowing into

this account from or on behalf of investors, along with over $110 million transferred in from known promoters. These records also show Beasley either withdrawing money directly from the trust account or transferring money to his firm's operating account—apparently to pay off millions of dollars in gambling debt and fund a lavish lifestyle. These records further show trust account transfers to and from promoter accounts also held at Wells Fargo. Thus, for anyone who saw how Beasley was moving the Receivership Entities' funds, the pattern of misuse and embezzlement was self-evident.

8.   Wells Fargo had a bird's eye view of the fraud and knew Beasley was diverting and stealing the Receivership Entities' funds. Wells Fargo, as one of the nation's largest banks with sophisticated software and processes to detect unlawful transactions, observed firsthand Beasley's siphoning of the Receivership Entities' funds. Wells Fargo looked for such fraudulent activity because, as a regulated financial institution, it had to. Moreover, Wells Fargo is familiar with the proper use of an attorney trust account, as it offers and administers them in all 50 states, and agreed to the applicable procedures with the Nevada State Bar so it could offer such accounts in Nevada.

9.   Based on the recurrence of circuitous transactions, cash withdrawals and cashier's checks, transfers to related-party and/or shell companies, and payments back to investors, Wells Fargo knew Beasley was not deploying the Receivership Entities' funds for investment purposes or otherwise using the money for their benefit. Instead, the pattern observed by Wells Fargo shows Beasley running a fraudulent enterprise and looting the Receivership Entities.

10. Wells Fargo also knew that the Receivership Entities were transacting with investment funds. Various account opening documents and memo lines for incoming deposits and transfers expressly stated that purpose. Also, none of the promoters hid the fact that their accounts, many of which were also at Wells Fargo, related to investments. Moreover, various Wells Fargo employees had regular contact with Beasley to service his needs—one even had a recurring weekly appointment with Beasley to process all his transactions.

11. With its goal to maximize assets held, account and transfer-related revenue and compensation, Wells Fargo and its employees accommodated Beasley's pattern of misuse and misappropriation. For example, Beasley moved millions of dollars through his trust account

monthly, thus necessitating countless authorizations and branch visits. Wells Fargo also processed Beasley's many cash withdrawals, payments for luxury vehicles, and transfers for real estate purchases—all from the Receivership Entities' funds.

12. Without Wells Fargo's help in facilitating Beasley's looting of the Receivership Entities' funds, the scheme would have stalled, leaving the Receivership Entities with significant funds that could have been used for legitimate, profit-generating investments or simply held to later return capital to investors. But with Wells Fargo's assistance, Beasley's wrongdoing went uninterrupted until the Government intervened. Now, the Receivership Entities face significant liability to the counterparties to the settlement investment contracts. With no legitimate revenue—and Beasley in federal custody—the Receivership Entities' ability to recoup their funds is limited. Wells Fargo is thus responsible for the nine-figure liability facing the Receivership Entities.

## PARTIES AND RELEVANT NONPARTIES

### I.  Plaintiff

13. The Receiver is a natural person over the age of 21 and otherwise *sui juris*. He is a citizen and resident of Oregon.  The Receiver's authority derives from the Receivership Order entered by Judge Mahan in the SEC Action (now overseen by Judge Silva). Among other things, the Receiver is charged with marshaling and preserving the assets of the Receivership Estate and investigating and prosecuting claims for the benefit or on behalf of the Receivership Estate.

### II.  Defendant

14. Wells Fargo is a nationally chartered bank, headquartered in Sioux Falls, South Dakota, and with its principal place of business in San Francisco, California.  Wells Fargo is one of largest banks in the United States, providing banking products and services to businesses, consumers, and institutions in all 50 states and boasting $21.5 billion in net income for 2021.

### III.  Nonparties

15. Matthew Beasley is a resident of Nevada.  Beasley has been an attorney since 2006 and, at all relevant times, served as President, Secretary, Treasurer, and Director of Beasley Law Group PC.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

5

16. Beasley Law Group PC is a professional corporation organized in Nevada in 2011 with its principal place of business in Nevada. Beasley controls this entity, but its IOLTA ending in 5598 is under the exclusive control of the Receiver.

17. Jeffrey Judd is a citizen and resident of Henderson, Nevada.  During all relevant times, Judd controlled each of the Receivership Entities.

18. J&J Consulting Services, Inc. is a Nevada corporation formed in 2005 with its principal place of business in Nevada ("J&J Nevada").  J&J Nevada is now under the exclusive control of the Receiver.

19. J&J Consulting Services, Inc. is also the name of an Alaska corporation, incorporated in 2019, with its principal place of business in Nevada ("J&J Alaska"). J&J Alaska is now under the exclusive control of the Receiver.

20. J and J Purchasing LLC ("J and J Purchasing") is a Florida limited liability company formed in October 2021 with its principal place of business in Nevada.  J and J Purchasing is now under the exclusive control of the Receiver.

21. Among others, Christopher Humphries, Shane Jager, and Jason Jongeward are alleged to have promoted and administered the J&J Investment individually and through their companies.

### JURISDICTION AND VENUE

22. This action is brought to accomplish the objectives of the Receivership Order and is ancillary to the SEC Action pending in this District.  This Court thus has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 754, 1367. In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Receiver, along with the Receivership Entities, and Wells Fargo are citizens of different states and the amount in controversy exceeds $75,000.

23. This Court has specific personal jurisdiction over Wells Fargo because the Receiver's claims arise out of Wells Fargo's activity and unlawful conduct in Nevada.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts complained of herein occurred in this District, Wells Fargo transacts business and may be found in this District, and the SEC Action is pending in this District.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

25. All conditions precedent to this action have occurred, been performed, or have been waived.

<u>**FACTUAL ALLEGATIONS**</u>

**I.     The J&J Investment Scheme**

26. Beasley started the J&J Investment scheme to pay off his significant gambling debts. Beasley represented himself as having contacts with personal injury attorneys around the country and described an investment opportunity for those willing to make short term settlement advances. The investment funds were to be provided to personal injury claimants who wanted their settlement funds as soon as possible. In exchange, when the defendant or payor in those personal injury cases funded the settlements, Beasley would recoup the advance and collect a significant interest fee. The J&J Investment was thus premised on the concept that, by providing immediately liquidity to claimants with a signed settlement agreement, investors could earn a sizable return within a short period.

27. His first "investor" was Judd, a friend and former client of Beasley and his firm.  After Judd made his investment and reaped a return, Beasley and Judd sought to expand the investment opportunity by attracting more investors and drawing commissions from the investments.

28. Beginning as early as 2017, Judd used the Receivership Entities to raise funds to make settlement advances through Beasley's contacts. That was the start of the J&J Investment.

29. As Beasley admitted during his standoff with the FBI, Beasley "made up more attorney's deals and just kept growing it" to meet the growing number of investors Judd was finding.

30. The J&J investment opportunity was pitched to investors as "lawsuit settlement contracts." The Receivership Entities, through Beasley, were allegedly making advances to personal injury claimants across the country who had reached a settlement but wanted their settlement money immediately.  These supposed plaintiffs would sell their interests in their forthcoming settlement proceeds to one of the Receivership Entities in return for an advancement of funds.  The plaintiff would then repay the Receivership Entity 90 days later, plus interest.

31. The Receivership Entities sold participation in these contracts at $80,000 or $100,000 increments, although investors sometimes purchased partial contracts. The fees and interest

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

purportedly payable to the Receivership Entities made this opportunity lucrative. The Receivership Entities committed themselves to paying investors about 12.5% in 90 days (which amounts to approximately 50% per annum). And, upon maturity, investments would automatically roll over into a new settlement contract.

32. The Receivership Entities (first J&J Nevada and/or J&J Alaska and then J and J Purchasing) were the counterparties to the investor contracts describing the intended investment and stipulating the returns due to investors. Notably, the original investment contracts describe Beasley as the person who "assist[s] [Judd] in finding these [settlement advance] agreements and also to write the contracts." In the later, more formalized investment paperwork, Beasley's trust account is the designated account for capital deposits for the Receivership Entities and Beasley is noted as the "Buyer's Attorney" on the underlying settlement purchase agreements.

33. In addition, Judd and other promoters instructed that deposits should be made to Beasley.

34. In that capacity, Beasley served as the custodian for incoming Receivership Entity funds. After being expelled from his prior bank in early 2017 for questionable transactions, Beasley opened an Interest on Lawyers Trust Account ending in 5598 (the "5598 IOLTA") with Wells Fargo. When opening the 5598 IOLTA, Beasley told Wells Fargo that he was a solo practitioner attorney with $350,000 in annual sales. Nonetheless, Beasley used the 5598 IOLTA almost exclusively to handle the Receivership Entities' funds—but without any real investment activity.

35. Using this common structure and with Beasley's involvement as money manager, Judd and other promoters raised hundreds of millions of dollars, mostly through word-of-mouth referrals. Accountants at the SEC determined that over $490 million was deposited into the 5598 IOLTA with Wells Fargo from January 2017 to March 2022. And each time the promoters raised money for the Receivership Entities' investment purpose, the Receivership Entities became further obligated to make good on those contracts.

36. But Beasley was not using any nationwide network of plaintiffs' attorneys to buy interests in personal injury settlements. Nor was he using the Receivership Entities' funds for any legitimate investment. An SEC accountant has confirmed, following review of the 5598 IOLTA statements, there were no "transactions consistent with investment activity related to litigation settlements" or

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

"any incoming cash from personal injury law firms, lawyers, insurance companies, or tort claimants that would result from returns on insurance tort settlements." (SEC Action at ECF No. 2-8, at 5).

37. Instead, once the Receivership Entities' funds entered the 5598 IOLTA, Beasley transferred funds to the Receivership Entities' other accounts and those held by promoters, purportedly as commissions and investor returns. This money laundering enabled Beasley's wrongful conduct and allowed him to continue tricking the Receivership Entities with ostensible revenue. This money laundering also forms the basis for the criminal charges facing Beasley.

38. Through this money laundering, Beasley also transferred Receivership Entity funds from the 5598 IOLTA directly to his firm's operating account or simply made cash withdrawals from the IOLTA—all to enrich himself or pay off gambling debts at the expense of the Receivership Entities. All told, Beasley took in over $17 million from the 5598 IOLTA, together with almost $1 million withdrawn in cash or cashier's checks from the IOLTA.

## II. Wells Fargo Knew About and Assisted Beasley's Looting of the Receivership Entities

39. Wells Fargo's interactions with Beasley and other promoters confirm its knowledge of the nature and intended purpose of the J&J Investment. In delivering banking services to Beasley and the promoters, Wells Fargo employees became privy to how the investment operated (or was supposed to operate). Using its sophisticated internal controls and programs to detect fraud, Wells Fargo observed banking behavior that completely contradicted the stated operation. Wells Fargo observed the misappropriation and siphoning of funds by Beasley. And Wells Fargo knew that such actions with the Receivership Entities' funds were improper and harming the Receivership Entities.

40. Indeed, Wells Fargo is required by law to conduct inquiries into its customers' business and the propriety of their transactions. In this case, when Wells Fargo looked into Beasley's customer profile and noticed—either firsthand or through its programs—what Beasley was doing through his 5598 IOLTA, it gained actual knowledge that Beasley was diverting the Receivership Entities' funds. The transfers discussed below, along with the millions in cash and cashier's checks

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

withdrawn from the 5598 IOLTA and/or Beasley's operating account, show a pattern of money laundering and outright theft. Wells Fargo nonetheless kept housing Beasley's accounts and facilitating Beasley's transactions, all to the detriment of the Receivership Entities.

41. In other words, Wells Fargo cannot claim ignorance when a scheme of this magnitude is conducted through its accounts, much less when the primary wrongdoer's account is an attorney's trust account used for criminal money laundering.

42. Wells Fargo thus became more than just a bank processing Beasley's transactions. Wells Fargo became a knowing and active participant of Beasley's misconduct—all to keep active accounts and generate revenue.

**A. Beasley and Other Promoters Were Transparent with Wells Fargo About the Nature of the J&J Investment and Their Roles in Managing Funds**

43. No one hid from Wells Fargo that (i) the Receivership Entities were transacting with investment funds, (ii) the purpose of the funds was for the Receivership Entities to make profit-generating advances on personal injury settlements, or (iii) Beasley and other promoters were using their Wells Fargo accounts to aggregate and deploy the Receivership Entities' funds for the investment purpose and then receive and distribute the purported revenue in bulk.

44. To start, funds going into the 5598 IOLTA for the benefit of the Receivership Entities were expressly designated for investment purposes. For example, many investor transfers included the word "investment" in the memo line, along with a reference to their promoter. They even told Wells Fargo employees that they were making investments by sending funds into 5598 IOLTA. Other investment funds—over $110 million—entered the 5598 IOLTA through promoters, who similarly did not hide the purpose or nature of those capital infusions.

45. In addition to these obvious designations for incoming funds, Wells Fargo employees had direct and unfiltered contact with Beasley. Beasley processed most of the J&J Investment transactions in person with Wells Fargo bankers.

46. In fact, during a certain period, Beasley had a standing meeting with a Wells Fargo banker, whose initials are "S.N.," scheduled for every Wednesday. The purpose of these meetings was to effectuate most or all of Beasley's desired transactions—including cashier's checks directly from

the IOLTA and five-figure cash withdrawals—during a single weekly session. During these meetings, S.N. asked and was told about the purpose of these transfers and observed the flow of investment funds into and out of the Receivership Entities. Beasley appreciated the personal assistance and time given to efficiently processing his transactions and showed his appreciation on more than one occasion by gifting S.N. his favorite liquor.

47. Wells Fargo employees, including S.N., also allowed Beasley to wire money out that had just been wired into an account minutes or hours beforehand.

48. Wells Fargo employees, including S.N., knew Beasley's business well and knew Beasley on a first name basis, with Wells Fargo's business banking group apparently offering at least once to take Beasley to a professional hockey game.

49. Beasley also used these in-person appointments to make large cash withdrawals. Overall, Beasley withdrew approximately $1 million in cash (either in bills or for purchasing cashier's checks) from the 5598 IOLTA. He also withdrew additional millions in funds from his firm's checking account immediately following infusions from the 5598 IOLTA, all of which was entirely apparent to the Wells Fargo bankers processing his withdrawals.

50. Wells Fargo did not impede or obstruct Beasley's large cash withdrawals that clearly derived from the Receivership Entities.  The only obstacle facing Beasley occurred when the bank did not have enough cash to fund his withdrawals from time to time. In that case, Beasley would take whatever cash the branch had available or make a request for cash, which Wells Fargo would fulfill. Indeed, Wells Fargo employees knew Beasley's pattern so well that managers would volunteer to Beasley, without being prompted, that the branch vault had cash on hand for him to withdraw, especially when the branch had more cash than normal.

51. On one occasion, Judd and Beasley together visited a Wells Fargo branch to open an account for one of the Receivership Entities. They were forthright about the J&J Investment, how the account was to be used for movement of investment funds, and Beasley's role with respect to that Receivership Entity. Despite his lack of a managerial or shareholder position within the entity, Wells Fargo allowed Beasley to be a signatory on the account.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

52. The promoters, in turn, made clear to Wells Fargo that their entities and accounts were to be used to process investment funds relating to personal injury settlements. They disclosed in account opening documents that they were in the business of making investments in personal injury settlements. And when processing returns to investors, the promoters designated those transfers as "investment payments," "interest," or the like.

53. These promoters opened Wells Fargo accounts to enable account-to-account transfers, which had no transfer limits.

54. One promoter with a large network of investors and sub-promoters encountered the tedious task of manually processing various single transfers (to the investors) and bulk transfers (to the sub-promoters) when making weekly distributions.

55. Upon being informed of the issues and the need to process many bulk and individual transfers comprising investor returns, a Wells Fargo employee recommended Wells Fargo's DirectPay application, which, for a monthly cost, allowed that promoter to input transferee information just once and then use that system to run recurring transfers, much like paying monthly utility bills. Wells Fargo advertises this product for use "[p]ay[ing] employees and vendors" or "[p]ay[ing] employees, contractors (1099), and sales agents." But, in this case, Wells Fargo suggested deploying this product to run an investment club.

56. That promoter then encountered another issue: he was processing $2 million to $4 million in returns per week and the DirectPay system had a $250,000 daily limit on transfers. As a result, that promoter could not make all distribution payments in one sitting, causing them to break down return payments over the course of many days. That promoter again raised these issues with Wells Fargo employees, who suggested a subscription to another service called CEO Portal.

57. Another promoter already had CEO Portal to process investor returns, likely as a result of interactions with a Wells Fargo employee.

58. These and other interactions Wells Fargo had with Beasley and other promoters make clear that Wells Fargo knew that they were processing the Receivership Entities' purported investment operations through Wells Fargo accounts, with Beasley as the de facto fund manager.

**B.  Wells Fargo is Required to Know its Customers and the Nature of Their Business and Transactions**

59. In addition to Wells Fargo's direct contact with the investment managers and promoters, Wells Fargo confirmed its knowledge of their operations through its mandated procedures.

60. Wells Fargo is required by federal law to know its customers. *See, e.g.*, 31 C.F.R. § 1020.220. According to Wells Fargo, it complies with these obligations. Wells Fargo must know basic information about its customers when it opens an account for them and as they transact. This includes knowing about the individuals who control the accounts.

61. Wells Fargo must also conduct customer due diligence to gauge the risk of fraud, money laundering, terrorist financing, or other illicit account uses.  *See, e.g.*, 31 CFR § 1020.210. It is required to understand the types of transactions in which its customers are likely to engage and remain vigilant for transactions that may be suspicious. These laws impose on Wells Fargo a duty to understand the nature and purpose of their customer relationships and develop a customer risk profile.  This information must then be used for ongoing monitoring of its customers' transactions.

62. Such duties form part of the federally mandated compliance with Anti-Money-Laundering (AML) laws.  *See* 12 C.F.R. § 21.21.

63. Accordingly, Wells Fargo implements its customer identification and due diligence programs in a manner that allows it to (i) know who is in charge of each account, (ii) the nature and purpose of the account and the customer's business, and (iii) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

64. In connection with these programs and processes, Wells Fargo has a senior bank official responsible for compliance with AML requirements.  And at each branch, Wells Fargo maintains a bank employee to monitor the bank's day-to-day compliance.

65. The Federal Financial Institutions Examination Council ("FFIEC") sets standards and guidelines for banks to comply with their AML obligations.  FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct requiring further inquiry.   Relevant here to Beasley's banking activities, the FFIEC BSA/AML Examination Manual lists the following:

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c. "Unusual use of trust funds in business transactions or other financial activity."

d. "Customer makes high value transactions not commensurate with the customer's known incomes."

e. "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

f. "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

g. "Goods or services purchased by the business do not match the customer's stated line of business."

h. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity."

i. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

j. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k. "Funds transfers contain limited content and lack related party information."

l. "Funds transfers are sent or received from the same person to or from different accounts."

m. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

n. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

o. "Purpose of shell company is unknown or unclear."

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

14

p. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

q. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

r. "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

s. "Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

t. "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

u. "Funds are sent or received via international transfers from or to higher-risk locations."

66. As discussed below, Beasley opened the 5598 IOLTA—ostensibly for a single lawyer firm generating $350,000 annually—and immediately commenced a pattern of transactions indicative of fraud and money laundering. Wells Fargo nonetheless chose to continue processing transactions for Beasley.

**C. Wells Fargo Maintains Sophisticated Internal Controls and Programs to Detect Fraud**

67. To comply with FFIEC guidance and AML regulations, Wells Fargo maintains systems to monitor accounts and account activity for improper activity. This includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns. Wells Fargo is further expected to consult external sources, such as the internet, commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

68. Wells Fargo collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself from liability to third parties and reputational injury.

69. For this purpose, Wells Fargo maintains procedures to determine the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that Wells Fargo collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (*e.g.*, volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

70. Based on this information, as well as external resources like internet search engines and public and commercial record databases, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Wells Fargo learns that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity.

71. Wells Fargo also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

72. Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. These datapoints are then used to identify unusual and suspicious transactions.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

16

73. From 2011 to 2017, federal agencies fined and imposed other disciplinary measures on Wells Fargo for its compliance failings, including its AML oversight.

74. In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its systems. Following an audit, the bank adopted a risk-management framework and made other substantive changes, including realigning over 5,000 employees. The bank also devoted substantial resources to developing and implementing surveillance technology, including artificial intelligence software, designed to enhance Wells Fargo's account-transaction monitoring system.

75. Wells Fargo's deficient BSA and AML program also resulted in a Consent Order (the "2015 Consent Order") by the U.S. Office of the Comptroller of the Currency in *In re Wells Fargo*, No. AA-EC-201-79 (Nov. 19, 2015). The 2015 Consent Order was based on findings of "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') compliance covering the Wholesale Banking Group line of business." The OCC found that Wells Fargo's BSA/AML customer risk assessment practices were ineffective, its customer due diligence practices were unsatisfactory, and its monitoring and oversight practices were inadequate.

76. The 2015 Consent Order required, among other things, the establishment of a compliance committee, a comprehensive BSA/AML action plan, a comprehensive risk assessment of customer relationships, and development of appropriate customer due diligence and enhanced due diligence policies, procedures, and processes.

77. By 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws.

78. And following termination of the 2015 Consent Order in January 2021 (and another consent order relating to improper retail sales practices), Wells Fargo issued statements addressing its AML-related procedures and infrastructure. Specifically, it confirmed that it "undertook significant work to remedy the deficiencies that gave rise to the consent order and to enhance its BSA/AML compliance program" and suggested that it had built "the right risk and control infrastructure."

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

79. Wells Fargo later reaffirmed its commitment to meeting regulators' expectations for risk management and controls. Wells Fargo further touted that, since 2019, it "[l]aunched an enterprise-wide Risk and Control Self-Assessment program to assess operational risks and controls and ultimately to design additional mitigating controls as appropriate" and "[i]mplemented a new incentive plan for bank branches that is governed by stronger oversight and controls, and focused on customer relationships."

80. Thus, by the time Beasley opened the 5598 IOLTA and used it to process hundreds of millions of dollars, Wells Fargo's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided Wells Fargo with the tools to readily detect Beasley's misuse of the IOLTA.

81. In addition to its internal processes and software, Wells Fargo requires that its employees comply and be familiar with banking regulations and AML-related matters. Wells Fargo incorporates these concepts into job descriptions and performance evaluations.

82. Wells Fargo provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud. Supervising personnel then oversee the day-to-day issues and implementation of the Wells Fargo's compliance structure at its individual branches.

83. Wells Fargo's commitment to compliance is also reflected in its Code of Ethics and Business Conduct, which requires employees to "complete all customer due diligence requirements[,] be alert to—and report—suspicious activity," and sets the policy of "completing all required . . . Compliance training on a timely basis."

84. Wells Fargo bankers are trained to ask at least 20 fact-finding questions when opening new accounts. These questions include the use of the account and the customer's long-term intentions for the account. New accounts that are less than 60 days old are also subject to greater scrutiny and limitations, including mandatory review by additional personnel.

85. Similarly, a banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money laundering, including the purpose of the transaction, and the nature of the relationship between the parties. Wire transfers between $25,000 and

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

$100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A manager who approves outgoing wires often conducts a secondary review to confirm that the checklist questions were adequately addressed. Wire transfers above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization.

86. A similar process is employed for checks. Before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, payee, and depositor. When these efforts detect unusual activity, employees examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or service the account.

87. Many branch-level employees also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in certain accounts.

88. Bank employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000. Law firms may not be exempted from this requirement.

89. To complement these human efforts, Wells Fargo uses its advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

90. Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

**D.  Wells Fargo Knows the Purpose and Risks Associated with IOLTAs**

91. An attorney trust account, like the 5598 IOLTA, is a limited-use trust account offered only by qualified financial institutions. Wells Fargo offers attorney trust accounts nationwide and has taken the steps in those jurisdictions to comply with applicable requirements.  Wells Fargo is

authorized to maintain IOLTAs in Nevada and has formally acknowledged IOLTA-specific requirements with the State Bar of Nevada. For example, Wells Fargo must report overdrafts on the accounts to the State Bar of Nevada and IOLTAs must be clearly identified by the bank as "trust" or "escrow" accounts.

92. Nevada Supreme Court Rule 217 defines an IOLTA as a trust account maintained by a Nevada attorney as part of his or her legal representation to hold clients' funds "nominal in size or . . . to be held for a short period of time."  Earned interest on IOLTAs is disbursed to the Access to Justice Commission, an organization that helps fund legal aid for the state's low-income population. Because interest earned on IOLTA funds are donated, Nevada attorneys holding substantial funds for their clients typically hold those funds in accounts that bear interest for the benefit of the client, rather than in an IOLTA. Every month, Wells Fargo disburses IOLTA interest to the Nevada Law Foundation, and produces an IOLTA Remittance Report that includes various account information, including the average account balance for the period of remittance.

93. Because IOLTAs are attorney trust accounts, the State Bar of Nevada's Trust Accounting document recognizes that an attorney has a "non-waivable, personal fiduciary responsibility … for every penny as long as the funds remain in [his or her] possession."

94. The only permissible payments from an IOLTA are "payments on behalf of [a] client … including paying client costs and expenses (*e.g.*, court filing fees or deposition transcript costs) that the client has prepaid, disbursing settlement proceeds, paying yourself earned and undisputed legal fees, etc."

95. Wells Fargo thus understands what appropriate IOLTA activity and normal patterns look like. This includes predictable transfer activity, meticulous separation of client funds, notations to enable clear accounting of which funds belong to which clients, and no personal spending or commingling. As a result, Wells Fargo follows IOLTA-specific procedures in administering such accounts.

96. Wells Fargo also understands that attorneys overseeing IOLTAs are required to keep detailed ledgers for each client deposit and should not make checks drawn on IOLTAs out to cash

20

or withdraw cash from IOLTAs. Cash withdrawals are indicative of attorney misuse of IOLTA funds.

97. When used to pay earned, undisputed attorneys' fees, the transfers from IOLTAs must be for the precise amount owed and made to the attorney. The attorney may not cover operating, personal, or other expenses from the IOLTA in lieu of direct payment for his or her fee.

98. Wells Fargo maintains a Legal Specialty group that, among other things, "gathers and compiles law firm data" on a quarterly basis, including "billable hours, revenue per attorney, profit, headcount, and trends by region and sector." The bank also uses its proprietary Comparative Analytical Tool (CAT) to process the data and glean relevant insights on the industry. Thus, Wells Fargo also has substantial insight into the typical revenues and incomes associated with different law practices, including a solo Las Vegas family law practitioner like Beasley.

**E. Wells Fargo Conducted Due Diligence into Beasley and Knew the Account Activity It Could Expect in the 5598 IOLTA**

99. Consistent with the foregoing, Wells Fargo conducted its due diligence and formed expectations about Beasley's proper use of the 5598 IOLTA.

100. On January 26, 2017, Beasley, on behalf of his law firm, applied for an Analyzed Business IOLTA. Beasley physically visited a Wells Fargo branch to open the account, as Wells Fargo does not make IOLTA applications available online. This application resulted in the opening of the 5598 IOLTA.

101. According to account opening records filed in the SEC Action, Beasley submitted the application at the 215 Wells Fargo branch located at 6585 N. Decatur Blvd., Las Vegas, NV 89131, with the help of Wells Fargo personal banker Virginia Arreola.

102. In the application, Beasley identified himself as the sole owner of Beasley Law Group PC, and sole signatory on the IOLTA. He reported annual gross sales for his firm of $350,000 and noted the sales market for his business was "local."

103. The mailing address Beasley provided for the account was the address of his personal residence: 1872 Shy Albatross Avenue in North Las Vegas, Nevada. The "Bank Use Only" portion

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

of the account application stated that the bank conducted a verification of Beasley's law firm with the Nevada Secretary of State.

104. At that time, Beasley advertised his firm as a solo "family law and personal injury practice." The website for his firm had a basic design and limited functionality, thus confirming a locally based, solo practice consistent with Beasley's estimated gross revenues of $350,000 per year.

105. The 5598 IOLTA was an "Analyzed IOLTA" and, as such, was linked to another Wells Fargo account per bank policy.  Account records for the 5598 IOLTA show that Beasley's firm maintained at least two business checking accounts at Wells Fargo: (i) a business checking account ending in 5580, and (ii) a second business checking account ending in 8898. The fact that Beasley asked Wells Fargo to open a second checking account for his firm, with no practical justification for a one-person law firm to need multiple checking accounts at the same bank, implicated at least one FFIEC red flag known to the bank, which arises when a "[c]ustomer . . . establishe[s] multiple accounts in various . . . names that lack sufficient business purpose for the account complexities."

106. Moreover, because Wells Fargo knew the 5598 IOLTA was an active attorney trust account under the State Bar of Nevada's rules, it knew that Beasley owed fiduciary duties to the clients or other depositors who held money in the 5598 IOLTA.

**F.   Beasley Used the 5598 IOLTA to Perpetrate a Ponzi Scheme with the Receivership Entities' Funds, Thereby Triggering Suspicious Activity Systems and Notifying Wells Fargo of the Misappropriation**

107. By the time Beasley opened the 5598 IOLTA, Beasley had already taken in funds for the J&J Investment. He had received and used that money in his prior trust and checking accounts with a different bank.  There, he used that money to write himself large checks, make personal purchases, send false investor returns, and/or make cash withdrawals. That caused Beasley's prior bank to terminate the relationship. The 5598 IOLTA was therefore opened so Beasley could continue growing the Ponzi scheme and diverting funds. And that is exactly what he did, processing the same types of transactions but on a much larger scale.

108. Wells Fargo, through its due diligence, understood the restrictions and anticipated use of the 5598 IOLTA and Beasley's related accounts. Wells Fargo forecast that the 5598 IOLTA would be used in a manner consistent with a solo practitioner's law firm earning less than half a million dollars per year. The bank monitored Beasley's activity with these parameters in mind.

109. However, from the very start, Beasley used the 5598 IOLTA totally inconsistently with that anticipated activity. The account activity instead suggested Beasley was operating an investment enterprise. Even worse, the account activity was rife with wire fraud and money laundering.  Unsurprisingly, this account activity triggered one red flag after another, as described below.

110. As the SEC's forensic accountant confirmed in the SEC Action, based on his review of the 5598 IOLTA bank records, a pattern of suspected Ponzi activity was already apparent by January 2017, the month the 5598 IOLTA was opened.

111. Wells Fargo and its employees took note of the suspicious activity. As alleged in a related action, a former Regional Banking District Manager of a Wells Fargo branch in Henderson, Nevada, recalled a number of individuals physically present at a branch to deposit or transfer funds into the Beasley IOLTA. The manager recalled that branch personnel concluded that the transactions were suspicious and had doubts about their propriety. Those personnel, pursuant to Wells Fargo protocols, contacted a corporate group within Wells Fargo to convey their suspicions about the transactions. In each of the multiple instances, however, Wells Fargo responded to the reports by directing the branch employees to execute the suspicious transactions.

112. Beasley's improper use of the 5598 IOLTA was therefore apparent from the start.  Yet, Wells Fargo facilitated this use for over five years and through countless transactions involving hundreds of millions of dollars. Without Wells Fargo's active assistance, the J&J Investment would have stalled, and Beasley's misappropriation and diversion would have been revealed much earlier. Indeed, Wells Fargo assistance through the 5598 IOLTA allowed Beasley to disguise the nature of the Receivership Entities' funds so that they could be repurposed as profits and commissions from nonexistent investments.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

**1. The Activity in the 5598 IOLTA was Totally Inconsistent with Beasley's Law Practice and Instead Suggested Operation of an Investment Company**

113. Despite telling Wells Fargo that the 5598 IOLTA would be used to service a solo practitioner firm with $350,000 in annual revenue, Beasley immediately began processing hundreds of thousands—and then millions—of dollars through it *every month*. Between 2017 and 2022, Beasley moved almost half a billion dollars through the 5598 IOLTA.

114. Beasley's use of the 5598 IOLTA was thus higher than forecast by Wells Fargo from the very beginning and grew exponentially over time. The SEC's forensic accountant prepared the below table to demonstrate the volume of funds flowing through the 5598 IOLTA:

| Beasley IOLTA Account | | |
|---|---|---|
| Wells Fargo - 5598 | | |
| Year | Average Monthly Inflows | Average Monthly Outflows |
| 2017 | 583,907 | (546,036) |
| 2018 | 1,370,127 | (1,291,958) |
| 2019 | 4,147,822 | (4,096,741) |
| 2020 | 9,240,054 | (9,045,776) |
| 2021 | 20,435,193 | (20,317,308) |
| 2022 | 28,399,421 | (30,110,959) |

115. According to the SEC's accountant, a total of $491.5 million was deposited into the IOLTA between January 2017 and March 2022.

116. Thus, the volume of funds passing through the 5598 IOLTA reflected a material disparity between what Wells Fargo expected from Beasley's law practice and his actual use of the account.

117. Wells Fargo also maintained Beasley's firm's checking accounts and thus observed and assisted Beasley's moving of Receivership Entity funds from the 5598 IOLTA into those accounts as ostensible firm revenue—again contradicting Beasley's stated income. Attorney earnings that flow through an IOLTA typically make up only a portion of a practitioner's income.

118. Within months of opening the 5598 IOLTA, Wells Fargo moved into Beasley's operating account funds that far exceeded Beasley's stated gross annual revenue. By May 2017, Beasley had

24

already transferred out of his 5598 IOLTA more than the $350,000 in stated gross annual revenue. Around the same time, Wells Fargo permitted Beasley's large cash withdrawals, such that by the end of June 2017, he had already withdrawn over $355,000 in cash.

119. Beasley's activity in siphoning off Receivership Entity funds grew unimpeded over time. Between January 2017 and March 2022, Beasley transferred a total of $17 million from the 5598 IOLTA into his firm's operating accounts, including several transfers of hundreds of thousands of dollars. These include regular and frequent transfers ranging from $20,000 to over $400,000.

120. According to the SEC, between 2017 and 2022, a total of $17.1 million in funds flowed from the IOLTA to the Beasley firm's operating accounts. These purported revenues were approximately 10 times what Wells Fargo was told to expect when opening the 5598 IOLTA. In addition, such earnings would have made Beasley an outlier in Nevada among lawyers with similar practice areas.

121. Indeed, Beasley's use of the 5598 IOLTA was wholly inconsistent with that of a solo practitioner in the family law and personal injury fields.

122. None of the deposits into the 5598 IOLTA suggested, for example, they were litigation settlement proceeds. IOLTA deposits usually include notations indicating the client or case to which the money pertains, which helps with accounting. Clients are often named as co-payees on checks or deposits for this purpose. In the case of the 5598 IOLTA, however, the transfers and deposits named Beasley's law firm as the sole payee and often contained no notations.

123. The SEC confirmed that the 5598 IOLTA received no incoming deposits or transfers from law firms, lawyers, insurance companies, or tort claimants.

124. Instead, the names of the parties transacting with the 5598 IOLTA ruled out any possible connection with the sort of law firm Beasley described to Wells Fargo. Dozens of recipients and depositors of funds had the words "Capital," "Investment," "Holdings," and the like in their name, thus suggesting the transfers pertained to investment activity.

125. Such activity was also confirmed by notations included by investors when transferring money into the 5598 IOLTA. As noted above, persons making investments with the Receivership Entities were instructed to send their funds to the 5598 IOLTA so Beasley, on behalf of the

Receivership Entities, could deploy the funds for their intended purpose. So when investors transferred funds into the 5598 IOLTA, they often disclosed that the deposit was for investment purposes.

126. For example, some investors included terms like "Capital Investment," "Investment," "Reinvestment," and "Contract," when ordering wires or making deposits. These wires were sometimes made in person, requiring discussion, review, and approval by Wells Fargo employees. Wells Fargo thus knew that Beasley was taking in and managing investment funds through his 5598 IOLTA, and not running the law firm he had described when opening the account.

127. In addition, the account activity for the 5598 IOLTA showed no prompt and proportionate disbursements to Beasley's clients, an alternative scenario that would have supported the notion that Beasley was receiving funds in connection with his stated law practice. For example, in March 2017, all recorded debit transactions were for cash withdrawals, transfers to Beasley's firm's operating account, and an apparent payment for Beasley's personal expenses.

128. The large deposits also could not be justified as retainers for Beasley's law practice, as trust deposits are supposed to be nominal in amount or short term in duration. A large retainer would be permissible only if it could be earned quickly. With Beasley operating as a solo practitioner, a single transfer of a $100,000 would be suspect, not to mention a continued stream of similar transfers totaling millions per month.

129. The transfers from the 5598 IOLTA into Beasley's operating account also indicated Beasley was paying himself something other than earned fees. These transfers were mostly in amounts divisible by $5,000 and did not vary enough to reflect hourly fees. Nor did the transfer resemble a percentage-based fee, as the transfers were too numerous and inconsistent with any reasonable percentage of a recovery.

130. These disparities implicated various FFIEC red flags for the 5598 IOLTA, which Wells Fargo was monitoring for such purpose, including:

    a. "customer makes high value transactions not commensurate with the customer's known incomes;"

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

b. "[a] large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity;"

c. "[g]oods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity;"

d. "[a] retail business has dramatically different patterns of currency deposits from similar businesses in the same general location;"

e. "[u]nusual use of trust funds in business transactions or other financial activity;"

f. "[a] large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers;"

g. "[t]he stated occupation of the customer is not commensurate with type or level of activity;"

h. "[p]ayments or receipts with no apparent links to legitimate contracts, goods, or services are received;" and

i. "unusual use of trust funds in business transactions or other financial activity."

131. Wells Fargo, either through its direct oversight or its compliance processes (or both), observed what Beasley was doing through the 5598 IOLTA.

## 2. The 5598 IOLTA Showed No Real Investment by Beasley for the Receivership Entities

132. Even Beasley's actions as an investment manager for the Receivership Entities were inconsistent with those purported roles. As noted above, Beasley was responsible for taking possession of the Receivership Entities' funds and matching those funds with settlement advance contracts through his nationwide network of personal injury attorneys.

133. While Beasley did take in investment funds into the 5598 IOLTA—and that was clear to Wells Fargo—the account activity shows no actual investment transactions (*i.e.*, the purchase of any settlement advance contracts, incoming profits from law firms, etc.). Wells Fargo employees instead witnessed roundabout transfers, sizable cash withdrawals, and lavish personal purchases, with no investment activity.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

134. The SEC's accountant confirmed the account activity for the 5598 IOLTA showed no transactions "consistent with making advance payments to tort plaintiffs, or their lawyers and associated law firms who had reached settlements with insurance companies." No payments were made to or received from, for example, insurance companies, tort claimants, or their counsel.

135. Instead, as confirmed by the SEC's accountant, the primary inflows into the 5598 IOLTA were initial investments with the Receivership Entities, while the primary outflows were to promoters.  A total of $411 million, or about 84% of the funds leaving the 5598 IOLTA, were to promoters.

136. The account activity thus shows that Beasley was using incoming funds to pay distributions and commissions (along with personal expenses), and not any investment.  Beasley's statement during his standoff with FBI agents was correct—the 5598 IOLTA account activity proves a Ponzi scheme.

### 3. The Nature and Frequency of the Transfers in and out of the 5598 IOLTA Triggered Red Flags

137. Wells Fargo learned of the foregoing through its interactions with Beasley, promoters, and investors and because it was required to make such inquiry.

138. As explained above, Wells Fargo actively monitors accounts for transactions reflecting suspicious patterns, such as repeated, large, round-figure transfers. The account activity for the 5598 IOLTA shows that those types of transfers were the majority of inflows into the account. They came in increments of $40,000, $50,000, $80,000, or $100,000 (or multiples thereof).

139. The below account statement excerpts make this clear:

///

///

///

///

///

///

///

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

October 2017:

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 10/11 | 80,000.00 | Deposit Made In A Branch/Store |
| | 10/18 | 100,000.00 | WT Fed#01771 National Financial /Org=Mark A Murphy Srf# 0013200291HI Trn#171018029486 Rfb# Swf of 17/10/18 |
| | 10/18 | 50,000.00 | WT Seq#91016 Triple Threat Basketbal /Org= Srf# 0073048290131533 Trn#171018091016 Rfb# |
| | 10/18 | 50,000.00 | WT Fed#02400 Bank of America, N /Org=Acac, LLC Srf# 2017101800361142 Trn#171018162736 Rfb# 213909206 |
| | 10/19 | 100,000.00 | WT Fed#00660 Zb, NA DBA Nevada /Org=Herlean Financial Services LLC Srf# 2017101900002674 Trn#171019067462 Rfb# |
| | 10/19 | 80,000.00 | WT Fed#00661 Zb, NA DBA Nevada /Org=Herlean Financial Services LLC Srf# 2017101900002700 Trn#171019067498 Rfb# |
| | 10/24 | 50,000.00 | WT Seq124756 Shane M Jager /Org= Srf# 0000733297437583 Trn#171024124756 Rfb# |
| | 10/25 | 100,000.00 | WT Fed#02510 National Financial /Org=Mark A Murphy Srf# 5491100298Fm Trn#171025031395 Rfb# Swf of 17/10/25 |
| | 10/25 | 80,000.00 | Deposit Made In A Branch/Store |
| | 10/26 | 80,000.00 | WT Fed#02431 Bank of America, N /Org=Charles J Portz Srf# 2017102500417345 Trn#171026008677 Rfb# Kmapqk7Yg |

August 2018:

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 08/01 | 80,000.00 | WT Fed#04198 Jpmorgan Chase Ban /Org=Rumble Pest Solutions LLC Srf# 5402500213Es Trn#180801105544 Rfb# Dcd of 18/08/01 |
| | 08/01 | 80,000.00 | WT 0001032627648 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0001032627648 Trn#180801150223 Rfb# |
| | 08/01 | 80,000.00 | WT 0000342573859 Charles Schwab & /Org=Zzyzx Capital LLC LLC 2600 P V Srf# 0000342573859 Trn#180801151911 Rfb# |
| | 08/07 | 80,000.00 | WT Seq139789 Tmg LLC /Org= Srf# 0065784219692150 Trn#180807139789 Rfb# |
| | 08/08 | 80,000.00 | WT Fed#02241 Bank of America, N /Org=Derek Ronnebaum LLC Srf# 2018080700401539 Trn#180808013911 Rfb# 56Vlwvaau |
| | 08/08 | 50,000.00 | WT Fed#02963 US Bank, NA /Org=Donald B Rowland Srf# 180808027309 Trn#180808131704 Rfb# 180808027309 |
| | 08/14 | 40,000.00 | WT Fed#06956 Bank of America, N /Org=Brent D Barlow CPA Pllc Srf# 2018081400284930 Trn#180814080243 Rfb# C7Zcvjcu6 |
| | 08/14 | 40,000.00 | WT Fed#00019 State Bank of Sout /Org=William Bryce Huff Srf# 2018081400044749 Trn#180814153473 Rfb# |
| | 08/15 | 100,000.00 | WT 0000957892155 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0000957892155 Trn#180815139412 Rfb# |
| | 08/15 | 80,000.00 | eDeposit IN Branch/Store 08/15/18 01:32:56 PM 1985 E 7000 S Salt Lake City UT 5598 |
| | 08/21 | 100,000.00 | WT Fed#00936 Bank of The West ( /Org=Sz Properties LLC Srf# 2018082100004266 Trn#18082112960 Rfb# WT180821010465669 |
| | 08/21 | 50,000.00 | WT Fed#01350 Bank of America, N /Org=Portz Holdings LLC Srf# 2018082100370221 Trn#180821157635 Rfb# A39Sgfxsr |
| | 08/22 | 80,000.00 | WT Fed#00181 Navy Federal Credi /Org=Jeffrey M Peason Srf# Opf45540341 Trn#180822016663 Rfb# Opf900005179 |
| | 08/22 | 50,000.00 | WT Fed#02110 Bank of America, N /Org=Carli Marie West Srf# 2018082200018992 Trn#180822015007 Rfb# 4E9Kgmulq |
| | 08/22 | 80,000.00 | eDeposit IN Branch/Store 08/22/18 09:46:19 Am 1985 E 7000 S Salt Lake City UT |
| | 08/22 | 80,000.00 | WT 0001982975696 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0001982975696 Trn#180822083256 Rfb# |
| | 08/30 | 100,000.00 | WT Fed#03952 US Bank, NA /Org=Donald B Rowland Srf# 180830038386 Trn#180830171743 Rfb# 180830038386 |

140. Similarly, outgoing transfers from the 5598 IOLTA were typically in large, round numbers. By April 2020, Beasley had begun making regular transfers of millions of dollars per

month to a small group of entities, nearly all in round number amounts. And, at certain points, Beasley was making individual transfers exceeding $1 million more than once a day. Examples of this are provided below:

November 2020:

| | | |
|---|---|---|
| 11/02 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib095Cs66R on 10/31/20 |
| 11/02 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib095Cs8Mz on 10/31/20 |
| 11/05 | 38,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib096Dbgtb on 11/05/20 |
| 11/05 | 30,000.00 | WT Seq165498 Rosemary Sketchley /Bnf=Rosemary Sketkley Srf# 0072801310116704 Trn#201105165498 Rfb# |
| 11/09 | 597,375.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib096S54Qt on 11/07/20 |
| 11/09 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib096S55Z3 on 11/07/20 |
| 11/09 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib096S566V on 11/07/20 |
| 11/12 | 100,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib097Jxz94 on 11/12/20 |
| 11/12 | 50,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx8898 Ref #Ib097K7Q9H on 11/12/20 |
| 11/13 | 8,227.29 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib097R8Ycq on 11/13/20 |
| 11/16 | 580,280.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib097Yf5M3 on 11/14/20 |
| 11/16 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib097Yf8Rg on 11/14/20 |
| 11/16 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib097Yfbhf on 11/14/20 |
| 11/19 | 100,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib098Tkmbp on 11/19/20 |

November 2021:

| | | |
|---|---|---|
| 11/29 | 894,500.00 | WT Seq204497 J & J Consulting Servic /Bnf=J J Consulting Services, Inc Srf# 0075679333278494 Trn#211129204497 Rfb# |
| 11/29 | 1,888,000.00 | WT Seq204678 Stirling Consulting L L /Bnf=Stirling Consulting L.L.C Srf# 0075679333679494 Trn#211129204678 Rfb# |

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

December 2021:

| | | |
|---|---|---|
| 12/13 | 1,185,000.00 | WT Seq178444 Stirling Consulting LL /Bnf=Stirling Consulting L.L.C. Srf# 0075679347903306 Trn#211213178444 Rfb# |
| 12/13 | 80,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #lbOD4989Fq on 12/13/21 |
| 12/15 | 85,000.00 | WT Seq178869 FD Consulting Corp. /Bnf=FD Consulting Corp. Srf# 0075679349232326 Trn#211215178869 Rfb# |
| 12/15 | 144,000.00 | WT Seq197990 Rocking Horse Propertie /Bnf=Rocking Horse Properties LLC Srf# 0075679349808226 Trn#211215197990 Rfb# |
| 12/15 | 545,000.00 | WT Seq210549 Cj Investments LLC /Bnf=Cj Investments LLC Srf# 0075679349859226 Trn#211215210549 Rfb# |
| 12/15 | 193,000.00 | WT Seq210728 J & D Consulting Firm I /Bnf=J D Consulting Firm Inc Srf# 0075679349431326 Trn#211215210728 Rfb# |
| 12/15 | 155,000.00 | WT Seq210881 Desert Global Advisors, /Bnf=Desert Global Advisors, LLC Srf# 0075679349843326 Trn#211215210881 Rfb# |
| 12/15 | 335,000.00 | WT Seq210978 Triple Threat Basketbal /Bnf=Triple Threat Basketball LLC Srf# 0075679349514326 Trn#211215210978 Rfb# |
| 12/15 | 262,000.00 | WT 211215-211266 Bank of America, NE /Bnf=Acac LLC Srf# 0075679349265326 Trn#211215211266 Rfb# |
| 12/15 | 228,000.00 | WT 211215-211568 Bank of America, NE /Bnf=American Colocation Services Srf# 0075679349656326 Trn#211215211568 Rfb# |
| 12/15 | 379,000.00 | WT Fed#00905 US Bank NA /Ftr/Bnf=J and J Consulting Services Srf# 0075679349147326 Trn#211215211921 Rfb# |
| 12/15 | 1,000,000.00 | WT Seq213834 Stirling Consulting LL /Bnf=Stirling Consulting L.L.C. Srf# 0075679349284326 Trn#211215213834 Rfb# |
| 12/20 | 1,125,500.00 | WT Seq222516 J & J Consulting Servic /Bnf=J J Consulting Services, Inc. Srf# 0075679354789956 Trn#211220222516 Rfb# |
| 12/20 | 1,342,000.00 | WT Seq222630 Stirling Consulting LL /Bnf=Stirling Consulting L.L.C. Srf# 0075679354980066 Trn#211220222630 Rfb# |
| 12/22 | 40,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #lbOD6Cb93x on 12/22/21 |
| 12/22 | 90,000.00 | WT Seq172077 Rocking Horse Propertie /Bnf=Rocking Horse Properties LLC Srf# 0075679356168976 Trn#211222172077 Rfb# |
| 12/22 | 170,000.00 | WT Seq172256 FD Consulting Corp. /Bnf=FD Consulting Corp. Srf# 0075679356269976 Trn#211222172256 Rfb# |
| 12/22 | 306,000.00 | WT Seq174182 Cj Investments LLC /Bnf=Cj Investments LLC Srf# 0075679356061086 Trn#211222174182 Rfb# |

141. Approximately $411 million in outgoing funds were sent to entities controlled by five promoters: $313.7 to the Receivership Entities, $37.2 million to Stirling Consulting LLC, $31 million to CJ Investments, LLC, $12.3 million to Triple Threat Basketball, LLC, and $17.1 million to Beasley's law firm. Nearly all of these transfers were made in round-figure transactions and without a legitimate business purpose.

142. In addition, Beasley made direct payments to individual promoters out of the 5598 IOLTA. For example, Judd received about $1.5 million individually and through his trust, while another promoter received over $140,000.

143. Wells Fargo had a fulsome view of these transaction because it hosted accounts for the main promoters. As a result, Wells Fargo could see investment funds coming into the 5598 IOLTA for the benefit of the Receivership Entities, Beasley's failure to make any investment, Beasley's

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

repurposing of such funds as purported profits or commission, and the promoters' downstream distribution of purported profits—along with Beasley's siphoning of funds for himself.

144. Wells Fargo's systems were designed and its personnel were trained to catch these patterns. Under bank policy, Wells Fargo employees questioned the individuals transferring money into and out of the 5598 IOLTA. These questions include the purpose of the wire and their relationship with the recipient. Large wires required higher scrutiny and additional risk assessment and approval.

145. In addition, the transactions and patterns summarized above triggered various FFIEC red flags, including:

     a. "[m]any funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts;"

     b. "[f]unds transfer activity is unexplained, repetitive, or shows unusual patterns;"

     c. "[a] retail business has dramatically different patterns of currency deposits from similar businesses in the same general location;"

     d. "[c]ustomer makes high value transactions not commensurate with the customer's known incomes;"

     e. "[u]nusual use of trust funds in business transactions or other financial activity;"

     f. "[f]unds transfers are sent or received from the same person to or from different accounts;" and

     g. "[u]nusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

**4. The 5598 IOLTA was Used for Facially Impermissible Purposes**

146. Beasley also used the 5598 IOLTA in a manner inconsistent with proper trust accounting.

147. Beasley made frequent cash withdrawals from local Wells Fargo branches, a practice strongly discouraged and indicative of embezzlement. All told Beasley made approximately $1 million in cash withdrawals directly from the 5598 IOLTA. In addition, and as mentioned above, Beasley frequently transferred money from the 5598 IOLTA into his operating account and then made near-immediate cash withdrawals, which would have been apparent to Wells Fargo.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

148. These cash withdrawals were frequent and are estimated to exceed $10 million in the aggregate.  For example, Beasley withdrew a total of $120,576 in cash in May 2017 and $103,500 in October 2017.

149. Moreover, most cash withdrawals range from $15,000 to $60,000, which would have prompted bank personnel to file Currency Transaction Reports and possibly require a special order of currency if the bank did not have enough cash on hand.

150. The purpose of these cash withdrawals was to apparently pay off gambling debts owed by Beasley to bookies.

151. In addition, the account activity for the 5598 IOLTA shows Beasley using Receivership Entity funds to purchase or pay off cars, to make transfers to his personal account, and to make payments to title companies for the purchase of real estate.

152. Beasley also made questionable deposits into the 5598 IOLTA. These deposits are suspect because an attorney's funds should not be deposited into a trust account unless the money is a specific amount to be used to pay a bank service charge. Nonetheless, Beasley transferred nearly $2 million into the 5598 IOLTA from 2017 to 2021.

153. Moreover, the 5598 IOLTA was subject to large return payments. For example, a $150,000 transfer from Beasley's operating account was reversed as an errant transfer the same day he tried moving that money into the trust account.

154. The locations from which deposits were made also suggested impropriety with the use of the 5598 IOLTA. While the State Bar of Nevada strongly discourages allowing others access to an attorney trust account, Wells Fargo frequently processed deposits outside of Nevada, where his firm was located.  These out-of-state deposits occurred sometimes within hours of each other and at different branches in different states. All told, 154 electronic deposits were made into the 5598 IOLTA at 43 different branch locations.

155. The most frequently visited location for deposits was not in Las Vegas, Nevada, as one would expect of a local practice, but a Wells Fargo branch in Salt Lake City, Utah, visited at least 24 times to deposit funds into the IOLTA. Coupled with a few international deposits into the 5598

IOLTA, this pattern reinforces that Beasley was not using his accounts consistent with his stated occupation.

156. This activity in the 5598 IOLTA triggered several FFIEC red flags that Wells Fargo personnel and automated systems likely detected, including:

      a. "[u]nusual use of trust funds in business transactions or other financial activity;"

      b. "[c]ustomer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose;"

      c. "[f]unds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations;" and

      d. "[d]eposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

**III.    Beasley's Looting Continued Uninterrupted Until the Government Intervened**

157. The J&J Investment operation continued from 2017 to 2022, with the same overall process and movement of funds, namely Beasley's receipt of funds into the 5598 IOLTA for the benefit of the Receivership Entities, followed by Beasley repurposing the incoming funds as revenue from the (nonexistent) personal injury settlement contracts. At the core of Beasley's scheme was the 5598 IOLTA, which he used to launder the Receivership Entities' funds and continue the scheme. As time passed and the J&J Investment grew, the Receivership Entities became more and more indebted, with no real income or assets to offset its obligations to investors.

158. However, at one point in late 2021, the promoters instructed investors to begin wiring principal investments into a Receivership Entity account instead of the 5598 IOLTA. In principle, this process was consistent with the Receivership Entities as the investment vehicle. From there, the Receivership Entities transferred their funds into the 5598 IOLTA so Beasley could deploy the capital on settlement contracts. At least one investor was told that these transfers were required because too much money was flowing through the 5598 IOLTA and Wells Fargo would not allow that to continue.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

34

159. This process is believed to have lasted two weeks. Thereafter, Beasley resumed his receipt of incoming funds on behalf of the Receivership Entities through the 5598 IOLTA, and the J&J Investment continued to flow as it had for years.

160. From the viewpoint of Wells Fargo, the switch from, and then back to, the 5598 IOLTA as the receiving account confirmed that Beasley was receiving and administering investment funds of the Receivership Entities in a Ponzi-like manner. In other words, Wells Fargo for years had seen Beasley take in and then recycle those funds to generate false revenue; but, for those few weeks, it saw Beasley take in money directly from the Receivership Entities and then return that money to the Receivership Entities as purported revenue to make downstream payments.

161. This unique period occurred around the height of the J&J Investment operation, as 2021 saw Beasley processing over $20 million per month through the 5598 IOLTA. But instead of stopping Beasley, Wells Fargo continued to allow him full access to his accounts and related features, thereby enabling continued growth of the scheme and continued looting of the Receivership Entities into 2022.

162. This scheme then ended in March 2022, when FBI agents began executing search and seizure warrants.  The FBI arrived at Beasley's home and was met with Beasley holding a gun and threatening suicide.  Beasley then allegedly aimed his gun at the agents, who shot him twice. Beasley then ran inside, and a four-hour standoff followed.

163. During the standoff, Beasley admitted to operating the J&J Investment as a Ponzi scheme. He confirmed that he was supposed to use incoming funds to purchase make advances to personal injury claimants who reached a settlement but wanted their money immediately.  However, he did not make any such investment.

164. He also confirmed that he "never actually talked to" the supposed personal injury attorneys identified in the settlement contracts.  He simply "made up more attorney's deals and just kept growing it" as Judd found more investors. When asked what he did with the money, Beasley said "I kept it and used it to pay, basically pay them back to pay off gambling debts."

165. Beasley noted that the scheme would "be all clear as soon as they go through my emails and my bank records," presumably referring to the 5598 IOLTA records.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

166. It was not until this standoff with the Government that Beasley's misappropriation and diversion of funds stopped. But, as noted by Beasley himself, the damage was already done. Beasley has remained in federal custody since his standoff with the FBI.

167. At this point, the Receivership Entities had taken in hundreds of millions of dollars, not earned any real revenue, and had made distributions to investors and commission payments—all while remaining indebted to investors who believed the Receivership Entities were making the contractually-required investments in personal injury settlement contracts.

168. On April 14, 2022, the SEC sued Beasley, the Receivership Entities, Judd, other promoters, and their respective entities in the SEC Action. Thereafter, the SEC obtained appointment of the Receiver over most of the corporate defendants and various assets.

169. Upon his appointment, the Receiver was made "sole and exclusive officer, director and managing member of each of the [Receivership Entities]." (*See* SEC Action at D.E. 88). As a result, the prior officers, directors, and/or managers of the Receivership Entities were ousted and currently wield no authority over the Receivership Entities.

170. The Receiver is charged with, among other tasks, marshaling and preserving the assets of the Receivership Estate and investigating and prosecuting claims against third parties. (*Id.* §§ I, IX). The Receiver is authorized and directed to "investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate." (*Id.* ¶ 43).

171. Moreover, to ensure the orderly administration of claims against the Receivership Estate, parties are enjoined from commencing or continuing litigation against the Receivership Entities. (*Id.* §§ VII).

172. Since the Receiver's appointment, he has secured assets of the Receivership Estate aggregately valued at over $80 million. Despite this recovery, the Receiver estimates a significant loss due to Beasley's misuse and misappropriation of Receivership Funds. Considering the total inflows into the 5598 IOLTA of about $500 million dollars, the Receiver contends over $100

million is necessary to make the Receivership Entities whole and pay liabilities due to the hundreds of investors who transacted with the Receivership Entities.

173. On February 3, 2023, the Receiver asked the Court in the SEC Action for permission to engage undersigned counsel and, if deemed appropriate by the Receiver, to bring a lawsuit against Wells Fargo.  (SEC Action at D.E. 457). The Court granted this request on February 21, 2023.  (*Id.* at D.E. 471).

174. On March 29, 2023, Beasley was indicted on federal charges of wire fraud and money laundering in the Criminal Action.

175. The Beasley indictment references the 5598 IOLTA's role in receiving funds and how Beasley then used those funds to "create the illusion that personal injury plaintiffs existed, were borrowing money from Individual-1, and were repaying the loans with interest." (*Id.* ¶ 10).

176. The Criminal Action remains pending, along with the SEC Action.

177. Given Beasley's continued detention, the charges he is facing in the SEC Action and Criminal Action, and the collapse of the J&J Investment scheme, the Receivership Entities are unlikely to recover from Beasley an amount to make them whole.

178. The Receiver therefore brings this action to hold Wells Fargo accountable for knowingly assisting Beasley's wrongful and unlawful conduct and its role in the criminal enterprise, as described above.

## COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

179. The Receiver realleges and incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

180. Beasley, individually and through Beasley Law Group PC, owed a fiduciary duty to the Receivership Entities.  Specifically, as de facto investment manager and custodian of funds, Beasley was entrusted with and undertook the duty to care with respect to the Receivership Entities' funds. Beasley was required to use, maintain, and deploy the Receivership Entities' funds in their best interests and for profit-generating investment.

181. Beasley breached his fiduciary duties to the Receivership Entities.  Instead of using the Receivership Entities' funds for their intended investment purpose, Beasley ran a Ponzi scheme

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

with those funds, recycling and recharacterizing incoming funds as false revenue, while siphoning funds for himself. Such use of the Receivership Entities' funds was detrimental to the Receivership Entities and went against their purpose as investment companies.

182. Wells Fargo was aware that Beasley was breaching his fiduciary duties to the Receivership Entities and of its role in promoting Beasley's breaches.

183. As explained above, Wells Fargo learned early on that, using the 5598 IOLTA, Beasley was operating as fund manager for the Receivership Entities' investment activity. Based on Wells Fargo's contact with Beasley and promoters during account opening and administration, the notations on transfers into the 5598 IOLTA and investors' statements to Wells Fargo personnel about the investment nature of their transfers, and Wells Fargo's due diligence and monitoring of Beasley's accounts, including its review of AML red flags caused by Beasley's account activity, Wells Fargo knew that Beasley was taking in and managing the Receivership Entities' investment funds and thus owed fiduciary duties to the Receivership Entities.

184. Wells Fargo also observed firsthand Beasley operating a Ponzi scheme with the Receivership Entities' funds. Wells Fargo witnessed the 5598 IOLTA account activity, which showed transfers of investment funds for the benefit of the Receivership Entities and corresponding transfers back out to promoters as revenue.  Notably absent from such account activity were any transfers indicating investments or returns on investments. Put simply, Wells Fargo, through its active monitoring of the account and following up on red flags raised by personnel and/or its systems, saw Beasley receiving incoming funds and then sending them back out as fake revenue (*i.e.*, a Ponzi scheme). Because the Receivership Entities' funds were not, in fact, being used for investment purposes, Wells Fargo knew that Beasley was breaching his fiduciary duties to the Receivership Entities, which had entrusted him with those funds.

185. Wells Fargo nonetheless knowingly and substantially assisted Beasley in breaching his fiduciary duties to the Receivership Entities.  Wells Fargo allowed the 5598 IOLTA to be used in a manner that bore no reasonable resemblance to how such trust accounts are properly used (*i.e.*, operating an investment Ponzi scheme).  Wells Fargo facilitated, accommodated, and did not impede or stop Beasley's movement of funds, as described above, despite knowing the duties owed

by Beasley and the nature of the funds he was handling.  Wells Fargo executed all transactions requested by Beasley and coordinated regular in-person meetings to effectuate those transactions. Wells Fargo also suggested to promoters easier ways to make downstream distributions despite knowing where those funds came from and how Beasley was simply repurposing incoming investment funds as revenue.

186. Wells Fargo substantially benefited from assisting Beasley. Wells Fargo, through its banking relationship with Beasley, earned income from fees and from its possession of deposits.

187. As a proximate cause of Beasley's breaches and Wells Fargo's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial. Instead of being used for investment purposes or otherwise held for the benefit of the Receivership Entities, the Receivership Entities' funds were stolen by Beasley and/or used as fake profits to be distributed to promoters and investors. The Receivership Entities thus lost their funds and now face significant liability from investors who may be due return of their principal.

188. Wells Fargo's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Wells Fargo.

### COUNT II – AIDING AND ABETTING FRAUD

189. The Receiver realleges and incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

190. Beasley defrauded the Receivership Entities.  Instead of using the Receivership Entities' funds for investment purposes consistent with their understanding and Beasley's role as fund manager, Beasley ran a Ponzi scheme with those funds, recycling and recharacterizing incoming funds as false revenue, while siphoning funds for himself. Such use of the Receivership Entities' funds was detrimental to the Receivership Entities and went against their purpose as investment companies. Beasley thus made false statements of material facts and omissions on which the Receivership Entities relied to their detriment in administering the J&J Investment.

191. Wells Fargo was aware that Beasley was defrauding the Receivership Entities and of its role in promoting Beasley's fraud.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

192. As explained above, Wells Fargo learned early on that, using the 5598 IOLTA, Beasley was operating as fund manager for the Receivership Entities' investment activity. Based on Wells Fargo's contact with Beasley and promoters during account opening and administration, the notations on transfers into the 5598 IOLTA and investors' statements to Wells Fargo personnel about the investment nature of their transfers, and Wells Fargo's due diligence and monitoring of Beasley's accounts, including its review of AML red flags caused by Beasley's account activity, Wells Fargo knew that Beasley was taking in and managing the Receivership Entities' investment funds and was required to invest the funds.

193. Wells Fargo also observed firsthand Beasley operating a Ponzi scheme with the Receivership Entities' funds, instead of making legitimate investments. Wells Fargo witnessed the 5598 IOLTA account activity, which showed transfers of investment funds for the benefit of the Receivership Entities and corresponding transfers back out to promoters as revenue.  Notably absent from such account activity were any transfers indicating investments or returns on investments. Put simply, Wells Fargo, through its active monitoring of the account and following up on red flags raised by personnel and/or its systems, saw Beasley receiving incoming funds and then sending them back out as fake revenue (*i.e.*, a Ponzi scheme). Because the Receivership Entities' funds were not, in fact, being used for investment purposes, Wells Fargo knew that Beasley was defrauding the Receivership Entities, which had entrusted him with those funds.

194. Wells Fargo nonetheless knowingly and substantially assisted Beasley's fraud.  Wells Fargo allowed the 5598 IOLTA to be used in a manner that bore no reasonable resemblance to how such trust accounts are properly used (*i.e.*, operating an investment Ponzi scheme).  Wells Fargo facilitated, accommodated, and did not impede or stop Beasley's movement of funds, as described above, despite knowing the duties owed by Beasley and the nature of the funds he was handling.  Wells Fargo executed all transactions requested by Beasley and coordinated regular in-person meetings to effectuate those transactions. Wells Fargo also suggested to promoters easier ways to make downstream distributions despite knowing where those funds came from and how Beasley was simply repurposing incoming investment funds as revenue.

195. Wells Fargo substantially benefited from assisting Beasley. Wells Fargo, through its banking relationship with Beasley, earned income from fees and from its possession of deposits.

196. As a proximate cause of Beasley's fraud and Wells Fargo's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial. Instead of being used for investment purposes or otherwise held for the benefit of the Receivership Entities, the Receivership Entities' funds were stolen by Beasley and/or used as fake profits to be distributed to promoters and investors. The Receivership Entities thus lost their funds and now face significant liability from investors who may be due return of their principal.

197. Wells Fargo's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Wells Fargo.

## COUNT III – AIDING AND ABETTING CONVERSION

198. The Receiver realleges and incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

199. Beasley, personally or through his law firm, converted millions of dollars of the Receivership Entities, presently estimated to be over $97 million.  On information and belief, the 5598 IOLTA was used exclusively to transact with the Receivership Entities' funds, rendering all funds processed through the 5598 IOLTA, as a trust account, identifiable. Specifically, from January 1, 2017, to March 15, 2022, Beasley caused various transfers from the 5598 IOLTA, which contained the Receivership Entities' funds, into his personal account or his law firm's account, and Beasley made several cash withdrawals from the 5598 IOLTA or his firm's account. In addition, Beasley transferred from the 5598 IOLTA tens of millions of dollars to promoters and/or their entities.  Such transfers and withdrawals were unauthorized or premised on fraud. Beasley thus exercised wrongful dominion over the Receivership Entities' funds in denial of, or inconsistent with, the Receivership Entities' title or rights therein or in derogation, exclusion, or defiance of such rights.

200. Wells Fargo was aware that Beasley was converting the Receivership Entities' funds and of its role in promoting Beasley's conversion.

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

201. As explained above, Wells Fargo learned early on that, using the 5598 IOLTA, Beasley was operating as fund manager for the Receivership Entities' investment activity. Based on Wells Fargo's contact with Beasley and promoters during account opening and administration, the notations on transfers into the 5598 IOLTA and investors' statements to Wells Fargo personnel about the investment nature of their transfers, and Wells Fargo's due diligence and monitoring of Beasley's accounts, including its review of AML red flags caused by Beasley's account activity, Wells Fargo knew that Beasley was taking in and managing the Receivership Entities' investment funds and was required to invest the funds. Wells Fargo thus knew that the funds in the 5598 IOLTA belonged to the Receivership Entities and were thus held in trust and for the exclusive benefit of the Receivership Entities.

202. Wells Fargo also observed firsthand Beasley operating a Ponzi scheme with the Receivership Entities' funds, instead of making legitimate investments. Wells Fargo witnessed the 5598 IOLTA account activity, which showed transfers of investment funds for the benefit of the Receivership Entities and corresponding transfers back out to promoters as revenue.  Notably absent from such account activity were any transfers indicating investments or returns on investments. Put simply, Wells Fargo, through its active monitoring of the account and following up on red flags raised by personnel and/or its systems, saw Beasley receiving incoming funds and then sending them back out as fake revenue (*i.e.*, a Ponzi scheme). Because the Receivership Entities' funds were not, in fact, being used for investment purposes, Wells Fargo knew that Beasley was defrauding the Receivership Entities, which had entrusted him with those funds. In addition, Wells Fargo witnessed Beasley withdrawing or transferring out over $97 million from the 5598 IOLTA for use by Beasley or directed to promoters as false revenue. Under the circumstances observed, Wells Fargo knew that such withdrawals and transfers were unauthorized and/or premised on fraud and thus contrary to the Receivership Entities rights in and title to the funds in the 5598 IOLTA.

203. Wells Fargo nonetheless knowingly and substantially assisted Beasley's conversion. Wells Fargo allowed the 5598 IOLTA to be used in a manner that bore no reasonable resemblance to how such trust accounts are properly used (*i.e.*, operating an investment Ponzi scheme).  Wells

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

Fargo facilitated, accommodated, and did not impede or stop Beasley's movement of funds, as described above, despite knowing the duties owed by Beasley and the nature of the funds he was handling.  Wells Fargo executed all transactions requested by Beasley and coordinated regular in-person meetings to effectuate those transactions. Wells Fargo also suggested to promoters easier ways to make downstream distributions despite knowing where those funds came from and how Beasley was simply repurposing incoming investment funds as revenue.

204. Wells Fargo substantially benefited from assisting Beasley. Wells Fargo, through its banking relationship with Beasley, earned income from fees and from its possession of deposits.

205. As a proximate cause of Beasley's conversion and Wells Fargo's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial. Instead of being used for investment purposes or otherwise held for the benefit of the Receivership Entities, the Receivership Entities' funds were stolen by Beasley and/or used as fake profits to be distributed to promoters and investors. The Receivership Entities thus lost their funds and now face significant liability from investors who may be due return of their principal.

206. Wells Fargo's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Wells Fargo.

## COUNT IV – NEGLIGENCE

207. The Receiver realleges and incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

208. The Receiver brings this Count in the alternative.

209. The Receivership Entities caused their incoming investment funds to be deposited into the 5598 IOLTA.

210. Wells Fargo owed the Receivership Entities a duty of care in light of the special relationship created by Beasley's custody of the Receivership Entities' investment funds in the 5598 IOLTA, of which Wells Fargo knew and permitted. Wells Fargo learned early on that, using the 5598 IOLTA, Beasley was operating as fund manager for the Receivership Entities' investment activity. Based on Wells Fargo's contact with Beasley and promoters during account opening and

administration, the notations on transfers into the 5598 IOLTA and investors' statements to Wells Fargo personnel about the investment nature of their transfers, and Wells Fargo's due diligence and monitoring of Beasley's accounts, including its review of AML red flags caused by Beasley's account activity, Wells Fargo knew that Beasley was taking in and managing the Receivership Entities' investment funds and was required to invest the funds.

211. In addition, Wells Fargo observed firsthand Beasley operating a Ponzi scheme with the Receivership Entities' funds, instead of making legitimate investments. Wells Fargo witnessed the 5598 IOLTA account activity, which showed transfers of investment funds for the benefit of the Receivership Entities and corresponding transfers back out to promoters as revenue.  Notably absent from such account activity were any transfers indicating investments or returns on investments. Put simply, Wells Fargo, through its active monitoring of the account and following up on red flags raised by personnel and/or its systems, saw Beasley receiving incoming funds and then sending them back out as fake revenue (*i.e.*, a Ponzi scheme). Because the Receivership Entities' funds were not, in fact, being used for investment purposes, Wells Fargo knew that Beasley was engaging in wrongdoing with the Receivership Entities, which had entrusted him with those funds.

212. The harm caused by Beasley was thus foreseeable by Wells Fargo based on Beasley's role and conduct, and Wells Fargo was under an affirmative duty to prevent and stop Beasley's wrongdoing.

213. Despite the duty of care owed by Wells Fargo to the Receivership Entities, Wells Fargo failed at any point to prevent or stop Beasley's wrongdoing. Instead, Wells Fargo allowed the 5598 IOLTA to be used in a manner that bore no reasonable resemblance to how such trust accounts are properly used (*i.e.*, operating an investment Ponzi scheme).  Wells Fargo facilitated, accommodated, and did not impede or stop Beasley's movement of funds, as described above, despite knowing the duties owed by Beasley and the nature of the funds he was handling.  Wells Fargo executed all transactions requested by Beasley and coordinated regular in-person meetings to effectuate those transactions. Wells Fargo also suggested to promoters easier ways to make downstream distributions despite knowing where those funds came from and how Beasley was

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

simply repurposing incoming investment funds as revenue. Wells Fargo thus breached its duty of care to the Receivership Entities.

214. Because of Wells Fargo's negligence, Beasley continued to use the Receivership Entities' funds in a manner detrimental to the Receivership Entities.

215. As a proximate cause of Wells Fargo's negligence, the Receivership Entities suffered damages in an amount to be determined at trial. Instead of being used for investment purposes or otherwise held for the benefit of the Receivership Entities, the Receivership Entities' funds were stolen by Beasley and/or used as fake profits to be distributed to promoters and investors. The Receivership Entities thus lost their funds and now face significant liability from investors who may be due return of their principal.

## COUNT V – VIOLATION OF THE NEVADA UNIFORM FIDUCIARIES ACT

216. The Receiver realleges and incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

217. At all relevant times, Beasley, as fund manager for the Receivership Entities or as custodian and trustee of the Receivership Entities' fund through the 5598 IOLTA, was a fiduciary within the meaning of Nev. Rev. Stat. Ann. § 162.020(b).

218. At all relevant times, the Receivership Entities were principals within the meaning of Nev. Rev. Stat. Ann. § 162.020(c).

219. Wells Fargo is a bank within the meaning of Nev. Rev. Stat. Ann. § 162.020(a).

220. Beasley, in his capacity as fiduciary to the Receivership Entities, breached his fiduciary duties to, and defrauded, the Receivership Entities. Instead of using the Receivership Entities' funds for their intended investment purpose, Beasley ran a Ponzi scheme with those funds, recycling and recharacterizing incoming funds as false revenue, while siphoning funds for himself. Such use of the Receivership Entities' funds was detrimental to the Receivership Entities and went against their purpose as investment companies.

221. Wells Fargo had actual knowledge of Beasley's role and obligations with respect to the Receivership Entities' funds and that Beasley was defrauding the Receivership Entities. Wells Fargo learned early on that, using the 5598 IOLTA, Beasley was operating as fund manager for

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

the Receivership Entities' investment activity. Based on Wells Fargo's contact with Beasley and promoters during account opening and administration, the notations on transfers into the 5598 IOLTA and investors' statements to Wells Fargo personnel about the investment nature of their transfers, and Wells Fargo's due diligence and monitoring of Beasley's accounts, including its review of AML red flags caused by Beasley's account activity, Wells Fargo knew that Beasley was taking in and managing the Receivership Entities' investment funds and was required to invest the funds. Wells Fargo thus knew that the funds in the 5598 IOLTA belonged to the Receivership Entities and were thus held in trust and for the exclusive benefit of the Receivership Entities.

222. Wells Fargo also observed firsthand Beasley operating a Ponzi scheme with the Receivership Entities' funds, instead of making legitimate investments. Wells Fargo witnessed the 5598 IOLTA account activity, which showed transfers of investment funds for the benefit of the Receivership Entities and corresponding transfers back out to promoters as revenue.  Notably absent from such account activity were any transfers indicating investments or returns on investments. Put simply, Wells Fargo, through its active monitoring of the account and following up on red flags raised by personnel and/or its systems, saw Beasley receiving incoming funds and then sending them back out as fake revenue (*i.e.*, a Ponzi scheme). Because the Receivership Entities' funds were not, in fact, being used for investment purposes, Wells Fargo knew that Beasley was defrauding the Receivership Entities, which had entrusted him with those funds.

223. Wells Fargo thus violated Nevada's Uniform Fiduciaries Act by processing the transactions used to maintain and perpetuate Beasley's Ponzi scheme.

224. Alternatively, Wells Fargo had sufficient knowledge such that its actions in facilitating and executing the transactions out of the 5598 IOLTA qualify as bad faith, as these transactions were improper on their face.  As noted above, Wells Fargo observed the clear indicia that Beasley was using the 5598 IOLTA to breach fiduciary duties and defraud the Receivership Entities.  Wells Fargo thus acted in bad faith when it chose not to investigate or otherwise take steps to protect the Receivership Entities.

225. As a proximate cause of Wells Fargo's violations, the Receivership Entities suffered damages in an amount to be determined at trial. Instead of being used for investment purposes or

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

otherwise held for the benefit of the Receivership Entities, the Receivership Entities' funds were stolen by Beasley and/or used as fake profits to be distributed to promoters and investors. The Receivership Entities thus lost their funds and now face significant liability from investors who may be due return of their principal.

## REQUEST FOR RELIEF

WHEREFORE, the Receiver requests entry of a judgment against Wells Fargo awarding the following relief:

a. An award of damages and all other available monetary relief, including pre-judgment interest, on each claim and in an amount to be established at trial;

b. An award of punitive damages in an amount to be established at trial;

c. An award of reasonable attorneys' fees and costs; and

d. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Receiver demands a trial by jury on all issues so triable.

Dated May 4, 2023

**SEMENZA KIRCHER RICKARD**

*/s/ Jarrod L. Rickard*
Jarrod L. Rickard, Bar No. 10203
Katie L. Cannata, Bar No. 14848
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145

**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
(*pro hac vice forthcoming*)
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
(*pro hac vice forthcoming*)
Marcelo Diaz-Cortes, Esq.
Florida Bar No. 118166
(*pro hac vice forthcoming*)
100 SE 2nd Street
Miami Tower, 36th Floor
Miami, Florida 33131
*Attorneys for Plaintiff*

SEMENZA KIRCHER RICKARD
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803